Good morning, Your Honors, and may it please the Court, Mark Yohalam on behalf of the United States. Far from being outrageous, the ATF's investigation in this case was sensible, and it adhered to a pattern that this Court and other courts have often upheld. Let me talk about that first word, sensible. I assume you've read Judge Posner's opinion on this question. Yes, I have, Your Honor. Judge Posner says that the operators of stash houses should be willing to pay the United States government for what they have done in order to protect stash houses. Why is this sensible? Because the United States is not merely fighting a war on drugs. It is also fighting a war on violent crime. It's also trying to protect stash houses. No, Your Honor. It's trying to protect the communities in which stash houses are hidden, which are residential communities that are often prone to violence. Stash house robberies... There's no showing here that this was a neighborhood stash houses were hidden, is there? To begin with, it's a fictitious stash house, so... So how can you say, you know, they're trying to protect neighborhoods where stash houses are hidden when all they're after are, you know, imaginary stash houses? That would be in an imaginary neighborhood, right? It's protecting an imaginary stash house from a real robbery crew. That real robbery crew in discussing... But in this case, it's a crew that's put together by the government. Respectfully, that's incorrect, Judge Tsushima. At the first contact that the CIA has that's recorded, in that phone call, he doesn't say, can you put together a crew? That's what happened in Black.  Here the question is, do you have a crew? Answer, yes. Is it ready for some serious shit? Yes. This is a big thing, can they handle it? Yes. When he shows up to that first meeting, he does not show up alone. Hudson brings Whitfield. He's asked, do you have a larger crew? Yes. What kind of people do you have? He didn't have one, did he, at that time? Respectfully, he did, Your Honor. He spoke of a number of people he could rely upon and seek out. I know that, but none of those people were ever brought in. Well, one of them was. Well, this was somebody else that was not discussed earlier. There was only... And he was brought in, and you're talking about Dunlap, right? I am, Your Honor. And he was brought in at, you can read the records, at the urging of the DEA. I... So he was not a part of that organized, you know, gang at the time. Well, to begin with, he was not brought in at the urging of the DEA. It's the ATF in this case. But the ATF officer asked, how large a crew do you think you need? Whitfield and Hudson both responded, we need three people. The CI asks, are you sure you don't need four? Now, this is another significant distinction from Black. In Black, Simmons kept saying, I don't want a larger crew. And in that case, there was, they kept saying, you need more, you need more, you need more. And eventually persuaded him to bring in more. Here, the CI says, are you sure you don't need four? They say, no, we need three. Three is what we need. Here's the first guy we'd want to get. He's a reliable guy. His name is Baby Rowdy. He travels state to state jacking motherfuckers. He's big. He's younger. He's tough. They never got him, did they? They didn't get Baby Rowdy. So they went to the next best thing. They brought in Little Shooter. Little Shooter is Antoine Dunlap. Antoine Dunlap, also a member of a violent street gang, also with a criminal history, boasts of having committed armed robberies of a check cashing store in a western union. He also participates in the logistical planning of this crime. This is not an instance where the government ran a net through a poor neighborhood, pulled up three people who had no idea what they were doing, shoved guns in their hands, and then arrested them. It's exactly the opposite of that. Hudson approaches the informant and says, do you know of any robbery opportunities? Well, that's not what he says. He has some jargon for it. He uses the term come up. Yeah, do you have any come ups? That's correct. Yeah, which is a very odd word. Well, I mean, I'm not going to opine on the jargon that people use. I mean, different dialects use different terms. Come ups, it seems to me, does not necessarily mean do you have any stash houses we can rob. Do you have any opportunities for me? I disagree. The only evidence in the record is that what it means is robbery opportunities. And that's not just. That's what he said. Respectfully, Judge, it's not. Judge Fletcher said it could mean opportunities. Let me clarify. It could mean, and it seems to me, any robbery opportunity, which might mean, you know, a lightly protected 7-11. And what the Williams decision from this Court says is that when someone is contemplating committing a violent armed robbery, it's not a problem. Wait a minute. I didn't say this means armed robbery. It seems to me it means pretty much any robbery opportunity. I'm not sure that there is a material distinction that can be drawn between someone saying I want to commit a robbery and I want to commit an armed robbery in terms of. I have to say the law certainly punishes them differently. We regard them in terms of the government as very different crimes. That's correct. Isn't that why the ATF likes to get these people armed so you can go for the higher sentence? No, that's not correct, Your Honor. Didn't the ATF agents in effect tell these people you have to be armed? You've got to get guns. No, that's not correct, Your Honor. You can read the record that way, right? And they brought what the agent told them to bring in that bag, right? No, that's not correct. No, that's not. But it's true, isn't it, that the law treats an armed robbery different from a robbery that's where the robber is not armed? Well, I want to start with your reading of the record first, Your Honor, and then reach the question at the end. The ATF did not say bring guns. The undercover said that the stash house guards would be armed. That's nothing surprising. Of course stash house guards will be armed. And it was then the defendants who immediately said that they had access to guns and would bring them. It was Whitfield who repeatedly said he would bring a big gun, that he would go in first, prepared to knock some shit down if he had to, to kill if he had to, and repeatedly returned to that refrain. The ATF never suggested that they should bring guns, never said bring a rifle and a pistol, never said bring a shotgun and a pistol. That was entirely the defendants' planning. The ATF never gave them the guns. The ATF never brought them to places to buy the guns, never linked them up with a person to buy them. These were guns that the defendants said they had. And, again, this is a significant distinction from Black. In Black, although the defendants initially said they had guns, they then said they couldn't get them, and the ATF agent continually said you've got to get guns, you've got to get guns. Not a problem in Black. But as to the final question, as whether the law treats them differently, my point is not that the ultimate crime of strong-arm robbery of a 7-Eleven and armed robbery of a stash house are identical. The question is when an ---- I didn't say strong-arm either. I said robbery, and I'm not sure come-up means anything more than robbery, which would include armed robbery, which would include strong-arm robbery, which would include coming up to the guy and saying give me $25, which is a robbery. Well, the last case, if there were some threat of force. But regardless of how trivial a robbery one wants to imagine that Hudson was proposing, the question is whether at the time he says I'm looking for a robbery opportunity, the ATF is allowed to investigate that further. And ---- If the defendant here were able to prove that he had no propensity to commit this crime, would that amount to outrageous conduct on the part of the government? Absolutely not, Your Honor. Would you please turn your attention to United States v. Yuman Hernandez, where the panel wrote, the act of inducing a defendant to commit a crime he or she is not predisposed to commit is necessarily outrageous. Yes. So what do you do with that? The answer is Yuman Hernandez is a sentencing case. Yes, a sentencing case in which the question of outrageous conduct was deliberately addressed, and this is part of that discussion. Yes, but there are cases well before Yuman Hernandez saying again and again that the outrageous government conduct inquiry in terms of whether a crime has been committed at all is an objective inquiry that doesn't look at the defendant's predisposition. What Yuman Hernandez is basically doing ---- Outrageous conduct doesn't mean a crime was not committed. It means that the government has foreclosed from prosecuting the crime. That's correct, Your Honor. But there are two stages at which these kinds of claims can be brought. There is a pretrial outrageous government conduct request to dismiss the case, and then there is a mid-trial jury question. There are two. One is entrapment and the other is sentencing entrapment. Sentencing entrapment is also sometimes called outrageous government conduct with respect to sentencing, but it's a species of entrapment that looks at predisposition and inducement, whereas outrageous government conduct as a pretrial stage is an objective standard that looks at the government's conduct and whether that conduct was proportional to what the defendants were doing, saying. I'm not sure I agree with you. And certainly in Black, it's obvious that the two defendants there were not successful in showing that they were not predisposed. It strikes me as Yuman Hernandez is entirely consistent with Black, and it may very well be that if you're going to prove outrageous ---- excuse me, if the defendant is going to resist on the ground of outrageous conduct, he has to show that there was no propensity. Respectfully, I disagree. I think a defendant with a propensity to commit a stash house robbery can make out an outrageous government conduct claim. That's the outrageous ---- I agree with that, but if the defendant can show that he had no propensity, that I think under Yuman Hernandez tells me that there was outrageous conduct. Respectfully, if that's what Yuman Hernandez says, then that holding ---- If that's the case, counsel, that also suggests that a motion to dismiss should be denied and should be allowed to go to trial with the defense being allowed to claim that, yes, they did it, but they had no prior propensity to do it and were encouraged by the government to do it. That would be an entrapment claim, and it would not be enough to say that they were merely encouraged. They would have to show that they were induced. Or they could make a sentencing entrapment claim, as I expect they will when this case goes to trial, make a sentencing entrapment claim consistent with Yuman Hernandez. We're not asking the court to foreclose those claims. You know, James Carville made a famous comment in a somewhat different context saying you'll never know what shows up when you drag a $20 bill through a trailer park. You guys are dragging half a million dollars through a poor neighborhood. I disagree, Your Honor. There was no dragging in this case at all. In this case, Hudson approached the CI, not the CI approaching Hudson. There was no generalized offer being made. And even in the case where there was, as you describe it, dragging money through a neighborhood, in Black, this court found no outrageous government conduct. And the monetary inducement in Emmert and the monetary inducement in Williams were as significant or greater than they were here. In some ways, I think I have to give you the context in which I'm making these comments. We, of course, are bound by Black. We're bound by our case law. But that doesn't mean that I have to like the government's conduct. I think the government is wasting resources. I think it is encouraging people to commit crimes they otherwise would not commit. And you are protecting the stash houses. And then after we imprison these guys, we've got to pay for their imprisonment. I think it's a totally misguided policy. The law is the law, and I'm going to follow it. But I think you guys are making a mistake. And I understand, and the Simpson case makes clear, that courts are certainly welcome to express their displeasure with the law. But nevertheless, as Simpson says, our Constitution leaves it to the political branches to decide whether to regulate law enforcement conduct, which may offend some fastidious squeamishness or offensiveness about combating crime too energetically, but which is not antithetical to fundamental notions of due process. And so, respectfully, I understand that there are some people who are uncomfortable with this technique, but that's a question to be put to Congress. It's a question to be put to the President. And in that context, those concerns can be addressed. Finally, I see I only have two minutes left, but I want to address the reassignment question because I think that's also a significant issue before the Court. Let's do it this way. Let's stay on the merits. You've saved two minutes to rebuttal on the merits. It may be just as – it may be efficient to address the reassignment question after we've finished with the merits. I'm not sure the reassignment will take us very long, but let's do it separately from the merits. Roberts, Jr. Thank you, Your Honor. Good morning, Your Honor. So to please the Court, Lawrence J. Lippman. I represent Mr. Dunlop. Ms. Chahin represents Mr. Whitfield. We're going to split our time equally, seven and a half minutes. The comment of the law is the law and I'll follow it in this case, that's what Judge Wright did in his opinion. The Black case causes a lot of concerns. You see it in the brief. There's a lot of dissent in the panel. There was an en banc hearing. There was a dissent. I'm sorry, there is a typo in my opening brief on the footnote, and it's a very important footnote. It's the Judge Reinhart dissent in Black. On page 13 of my brief, I have two nines and there should be a ten. So when you're reading the reference, it refers to ten, and you might not be able to find ten. That's because I have two nines. But the quote is there and it references Judge Reinhart. And with respect to the law is the law and you'll follow it. Judge Wright did in his ruling follow the Ninth Circuit. He did not overrule or ignore the Black case. He did not follow Bonanno. He followed the test that Blackness. What did he follow in Black? It's a little bit of a red flag to a court of appeals when a district judge begins his opinion with a quotation from a dissent. Yes, but I think the dissent in all of the cases explain why this is outrageous. But what he does not withstand. That's true. And I may or may not be persuaded by Judge Noonan's dissent. I think it's a pretty powerful dissent for many of the reasons that Judge Fletcher has explained today. But that doesn't mean that that's the law. And we have Black and we have Williams and we have other cases in a very long The Black case, though, does set out tests. And Judge Wright did go through those tests and came to a conclusion that based on the facts of this case, the tests were met. So it wasn't a misapplication of law. He didn't use wrong law. He used the correct law or the current panel law and assessed each of the elements in Black and found in favor of Dunlop. The Ninth Circuit in Black did the same thing, actually. Different judges on Bonk Review reviewed the Black tests and came up with different conclusions using the same facts. So it's not that the law is necessarily wrong. It's on these facts I would find Black. Even in Black themselves, the judges were hesitant. They said we were sort of swung over the fence by the evidence that was before them. And so they themselves didn't overwhelmingly find that. In this case, however, I would submit that Dunlop did not have the propensity to commit a crime. That was in the record. The facts of this case show that he was indeed sought out to do a crime that he was never involved in. His record, I think, is on the record before you. He only had a small, it was a felony, but it related to an assault against a friend of his. He actually was living on the street in his car when he was picked up by Whitfield to go to a basketball game this day. So he was picked up at the end of the involvement. And then while he was there, he was questioned and brought in by the enemy. Counsel, what standard of review do we use for going over the district court's findings with respect to the Black factors? I believe it would be clear error. Is it clear error when the district court has had no opportunity to actually see the witnesses and all these working off of the transcripts, which we can also read for ourselves? Well, one of the problems with that is that he dealt with the facts that were before him. One of the facts before him, and this goes to a different issue, is to who called who. There's a great dispute on who initiated the contact with Hudson. The government says to you in their brief says that it was Hudson that approached the CIA. We actually don't have a transcript of that conversation, do we? Well, no. There's an affidavit that is written that the government filed in support of that, which says that the CIA was contacted by Hudson. An affidavit from whom? From an agent? From the agent. Okay. But that's not an affidavit from the CIA. Correct. And on the other hand, Hudson, I believe, is the transcript before you. Hudson, in his sentencing, is asked by Judge Wright, long after the fact, without, you know, the government calls it self-serving, but long after the fact, stands up at his sentence in the hearing and is asked by Judge Wright, all right, I want to know really what happened here. Why did you do this? And he said, you know, I had a longstanding debt with this guy. He called me up and said he wanted to deal with this. So his evidence is very different. It's like I owed this guy some money, the CIA, and he wanted to settle the debt. And so I basically went along with what he was asking for to satisfy him. It wasn't the facts of this case are there. And Judge Wright explains that in his judgment, that he doesn't accept the fact that the case was initiated by Hudson. So there's evidence before the court there that he did find and could have found. He also, in terms of their propensity, he also called, suggested that Hudson was a nickel-and-dime thief. He wasn't a small-time thief. So it isn't looking for people that are in an enterprise or have a propensity to do this. This type of sting is okay if you're attacking an existing enterprise. And certainly reverse stings are always legal in that aspect. In this case, however— No, this is an analogy that I'm not sure how close it is. Before I caught on to it, I used to get speeding tickets whenever I would be coming home from Lake Tahoe, driving through Auburn on I-80 with skis on the top of my car. I finally figured out that anyone with skis on the top of their car coming through Auburn five miles over the limit automatically got a ticket because we were an easy target. I was not going to shoot at the cop when he stopped me. The reason I say that is it's a lot easier and safer for the government to operate one of these reverse sting operations against small-time, unsophisticated would-be thieves than sophisticated big-time operators. They're picking on the people, or at least they have an incentive to pick on the people, who are not sophisticated, who will fall for this and will not be dangerous to the government. I see my time is running out. One last point is you said the $20 bill example. During the hearing in the transcript, Judge Wright said, if I was to send a notice out to Compton that we're giving away free money here, this courtroom would be full. So he used that as the same example that you did in the motion. Mr. Littman, in spite of all of your arguments, which to me just kind of chip away at the edges, the basic question that I face is, and as both Judge Bybee and Judge Fletcher have indicated, we're bound by black, and this case, to me, doesn't seem to be as bad as black. How do you distinguish this case from black? In other words, why shouldn't black apply, which is binding on our circuit, to this case? Well, in this case, I would submit that you could argue, as Judge Reinhart indicated, that there was an attack on the impoverished in this case, which wasn't the same in the black case. I think Judge Reinhart said what we've got to be concerned about is you could start doing this in impoverished areas, and that's what happened in this case. So this case factually went beyond and addressed the concern that Judge Reinhart made, is that this is different in factual basis because it does go beyond the ‑‑ it gets into the discrimination. When you say goes beyond, you mean goes after more impoverished victims or ‑‑ Yes, well, defendants in terms of this case. It's not going into ‑‑ Of course, there's nothing in the record to show that. It's all, and maybe Judge Wright notes, it's all his supposition, right, about these people being impoverished. Well, it's in the evidence as to where he was living in his car. It's in ‑‑ Judge Hudson said you dangle money in front of three broke dudes, so there is evidence that Judge Wright could have found. So you think that's sufficient for us to say black doesn't control this case because these people were shown to be impoverished? Factually, yes. I think that's an argument. There's also the ability of, well, I won't get into that in this time period, of I would say not following black, but that's a whole different subject of argument. It is. That's in the brief. That's an option available to you as a result, but that may be left for ‑‑ I'm not sure it's an option available. Yeah, but that's another argument for another day. Thank you. Good morning, Your Honors. My name is Sonia Shaheen and I represent Joseph Whitfield. I think I'd probably like to start and talk a little bit about black, but before I do that I'd like to talk about that it's no surprise to me, I've been practicing in federal court for about 20 years, and it's no surprise to me that these ATF stash house cases have drawn some of the most impassioned opinions that I've seen in my legal career. And I think that Your Honor's comments kind of echoed what's wrong with these cases, and I think a big part of it has to do with the fact that the government sets the parameters of the crime, the inducement that's being offered, and the arbitrariness of what's going on here. And because the government sets the parameters of the crime, they have the ability to remove the obstacles that usually face defendants in these types of cases, and we end up with a situation where a defendant is facing a sentence which really is grossly disproportionate to his own culpability or the types of crimes that he has the ability to commit. Because of the way the crimes are structured, defendants are lured into ‑‑ Your Honor, I think it also goes to the nature of the government's participation in the crime or Black Factor III, the government's role in creating the crime of conviction. So although, yes, it is a sentencing entrapment argument, I think that that's one of the factors that Judge Wright considered in dismissing the case. And as I was saying, we have a situation here where they're setting the scenario, removing the obstacles, offering the defendants an opportunity of a lifetime for committing a crime in two hours that's going to leave them set for life. And these are, as the Court has alluded, often very unsophisticated individuals who are being offered an opportunity that they may never see again. The officers allay their fears by agreeing to, you know, what would be a defendant's or someone's concern who's going to rob a stash house. Well, they might be concerned about are there armed people in there? How am I going to get in? So they allay their fears. And they say, well, you know, we'll put the U.C. He'll unlock the door for you. He's going to be in there. There's only two armed people. So what they do is they ‑‑ It would be dangerous enough they're going to bring guns, but insufficiently dangerous to deter them from doing it, from thinking they're going to do it. Yes, Your Honor. And as I state, I think that, at least in my experience from the cases that I've handled over the many years that I've been in practice, we have a situation here where the government structures the charges in such a way where most defendants, if they even choose to file or pursue the outrageous government conduct claim, are often looking at 15 to 25‑year mandatory minimum sentences, which is what happened with respect to my client. He was put in a position where he was ‑‑ he initially did plead guilty because he otherwise faced the prospect of a 25‑year mandatory minimum sentence. So the ‑‑ the facts are, you know, the posture of the case is stacked to even disincentivize defendants from being able to challenge the government's conduct. Another huge problem here, which the Court referred to is, you know ‑‑ I appreciate your argument, Ms. Shaheen, and I'm sympathetic to it, but all this really doesn't undercut the binding effect of Black and Williams, does it? Well, Your Honor, in ‑‑ it seems to me that although the court in Black said that it was not disregarding or overruling the Bonanno factors and indicated that it would still take them into consideration, I think the one primary fact that it really did not address is whether they are infiltrating an ongoing criminal organization. And so it seems to me that that is the type of fact which would maybe justify the ‑‑ even Judge Wright says it in his own opinion. But in Black they were not infiltrating an ongoing criminal organization either. I mean, I think my view is that the wisdom of this has been clearly expressed, but I don't see any way out from under Black. Well, Your Honor, Black is ‑‑ if that's where the court is concerned, let me speak about Black a little bit, because I think that Black is a little bit different than our case. Number one, in Black you have a testimony of a confidential ‑‑ I'm sorry, of a co‑conspirator, Simpson. And so what Simpson did was he was able to provide testimony about the fact that Alexander actually went through and organized the crime and assigned everybody rules. And so we don't have the situation in the Black case where, if I can look at the language from the case, what the court considered there was that once they set up the stash house, the UC studiously avoided telling them how to do the robbery, whom to bring, how many people to bring. But Alexander held an organizational meeting with the defendants to plan the robbery and assigned everyone rules. In that sense, this is very different from our case, because that's not what happened in our case. In our case, it was the UCs and it was the CI who basically directed everything, even when we had the one‑month delay where they said, oh, you know, the drug dealers are going to be in Mexico, so we're going to put this off. I mean, if this was really a crew of stash house robbers, why didn't they, you know, commit the crime during that period of time or find another stash house to rob? No, this was all at the direction and at the suggestion of the government. The other ‑‑ No, let me just say this. I'm sorry. Your co‑counsel took a little bit, or your associate counsel took a little bit of your time. Let's figure out, we'll wrap this up in about another minute. Yes, thank you, Your Honor. So in terms of the black panel, and another issue which I think is important in black is that the court made findings that the defendants were predisposed to committing these, a large‑scale drug trafficking crime. And in our case, certainly the court did not make any such finding. In our case, Your Honors, as I was talking about the arbitrariness and the inducement, Your Honor referred to the opinion of Judge Posner in the Mayfield case. And what happens is, is that when you have defendants who are faced with these extraordinary inducements, that just doesn't become ‑‑ it's not reliable evidence that they were actually predisposed to commit the crime for which they're being prosecuted. And we have a situation here where we have defendants who are facing ‑‑ I'm sorry, where Judge Wright found that the application of the black factors to our facts warranted the dismissal of the indictment. I would ask this court to affirm his judgment. Okay, thank you. Your Honors, before I begin, I just wanted to make sure I understood the framework. Address yourself only to the merits, and once you finish your minute and 30 seconds, we'll give you a chance to address the reassignment question. Thank you, Your Honor. The easy thing for me to do now would be to say, I understand Your Honors are uncomfortable with this investigative practice as you've acknowledged black controls and leave it at that. Respectfully and humbly, I would like to try to change your mind at least a bit about the crime itself. First, my opponent stated that unlike in black, in this case they targeted poor people. That is exactly backwards. In black, the evidence was clear that the CIA had been sent into poor neighborhoods knowing nothing about them other than that they were poor neighborhoods. There's no such evidence here. And on that point, I want to return to something that you said, Judge Fletcher, about the Carville quote about dragging a $20 bill through a trailer park. And again, I want to say this humbly, I just disagree with that sentiment quite strongly. And Judge Wright said the same thing here about if you put money in a poor neighborhood, anyone will jump at it. It's just not true that poor people will commit crimes. I'm not sure that I would agree that anyone would jump at it, but I think a lot of people would jump at it who otherwise are not going to commit an armed robbery of a stash house. Well, that is a very different proposition than what Judge Wright said, which is that no one would say no. And you only need to look at black to see that that's not true, because in black, the CIA went into a poor bar, approached a man named Curtis, gave him the opportunity, and Curtis said, no, I don't want to do it. Okay. You're now using up your time if you want to wrap it up. Yes. You also said that the ATF has an interest in not finding dangerous people who are going to threaten them. That is exactly backwards. I think you may say other things about the ATF, but their bravery in doing these undercovers is immense. Whitfield said he was down to shoot cops. He said, and I quote, if cops are behind me, I'm going to knock out the windows, point my gun at them, and tear that shit up. That's why I have a gun. Anyone has an incentive to reduce danger to himself. Undercover officers are operating in a very dangerous environment, and they do so bravely and with dedication. That doesn't mean they expose themselves to any more danger than necessary. Absolutely right, Your Honor. But they are seeking to follow black, and we're finished with this part of the argument. Understood, Your Honor. Next, let's do, I think five minutes is probably sufficient. Would you argue the reassignment question, please? Yes, Your Honor. The reassignment question is a totality-of-the-circumstances question, and certainly there are a number of small factors I could go through, but I want to focus primarily on three reasons for reassignment. I'm having trouble with the clock. If you'd put about, you talked a little bit, 4.45 on the clock. 4.45. Four minutes is fine, and then we'll let you run it over a little bit. We don't need to spend all our time fussing with the clock. Thank you, Your Honor. Go ahead. The first and strongest reason is the handling of this Court's order that an arrest warrant issue for Dunlap. Faced with that order, the district court instead met with Dunlap outside the presence of attorneys without notifying the government, without a court reporter, told him not to surrender himself, to instead remain at large for 48 hours, and then based on that ex parte, off-the-record communication, said that Dunlap should be released again. Well, let's assume that was error, but, you know, it's not every error that says the case should be taken away from the judge. I agree, Your Honor, and certainly not every error should mean the case is taken away. Very, very rarely should a case be taken away. I do think it is extraordinary. Obviously, I don't have close to the experience Your Honors have. I've never seen anything like that, whether when I was clerking or as a prosecutor in civil practice, where a representative party would meet ex parte with a judge, and the judge – Wait a minute. Meet ex parte. Describe what happened. Well, of course, we don't know exactly what happened, but apparently Dunlap showed up to Whitfield's dismissal hearing. So he shows up in the courtroom unexpected and uninvited. Correct, Your Honor. Okay, so we're not having one of these. I'm going to meet you in a coffee shop, judge and defendant. Correct, Your Honor. So it's open court. He shows up, uninvited, unexpected. The hearing is held. Judge Wright gets the order. First, the government gives the court the order from this court saying, Arrest Dunlap. The judge retires to Chambers and reviews the order. Comes out, holds a four-minute hearing saying that that order is cruel and unusual and outrageous and, you know, now I'm dismissing this to Whitfield and we'll see what I do about releasing Whitfield. The judge retires back to Chambers. The courtroom empties because everyone assumes proceedings are over. Apparently – I was in court that day. Apparently Dunlap was there. I certainly didn't recognize him or see him. Apparently Dunlap remains in the courtroom and presumably approaches the CRD, although now we're just speculating, and says, I'm here to surrender myself. Maybe he approaches the marshal in the courtroom or the blue coat and says, I'm here to surrender myself. And Judge Wright reemerges. The two of them have a conversation during which Dunlap again says, I'm here to surrender myself. Judge Wright says something to the effect of take 48 hours and come back and surrender yourself then and you better show up. Presumably he says something like that. And then 48 hours later Dunlap shows up. Okay. That's more useful than simply saying ex parte contact. I was using shorthand because I thought we had laid it out pretty – so second, I mean, I can talk more about that. I just want to make sure I hit the three points. The second is when during the hearing on whether to release Whitfield and Dunlap on bond or, as it turned out, without any bond, the court says the presumptions don't really apply in this case because the court has it on good authority from someone who ought to know that the defendants aren't looking at a lot of time. I think that that is – any reasonable observer would say that that is a degree of prejudging of the sentence, particularly where the defendants are looking at mandatory minimum sentences. That's also significant that when sentencing Hudson, the court imposed a very, very lenient sentence far, far below the guidelines and said that this was based primarily on the conduct of the government, not the defendant's characteristics, the nature of the offense, such that I think the comment that they're not looking at a lot of time takes on more salience. Finally, when the court said in response to you should follow the black descent, don't worry about it. I go my own way. That's why we call this luck of the draw. Now, I appreciate that that is an off-the-cuff comment. I also, of course, went to law school after the legal realist movement, the critical legal studies movement. I've watched confirmation hearings that make clear that many, many people believe that the legal system is just luck of the draw. It isn't. And I think when a judge says that, that at least creates an appearance of partiality along the lines of what this court talked about in the Sears decision or Judge McKeown talked about in her article that we cited to the court. And finally, the smaller factors would just be the court's repeated refusal to issue a temporary stay so that the government could appeal, requiring several emergency stays from this court, that the court recommended how Whitfield and Hudson should seek relief, and sua sponte put Whitfield on for a hearing, for a release, and then the tone of the court's order, although I think that's a fairly minor factor. Thank you. You can decide how to respond, whether it's a split time, do it all. Five minutes. Okay. We'll go two and a half each then, Your Honor. Five minutes total. Yes. Thank you. One of the problems in this application is the procedure which the government used. I know it's common to ask for that at appeal, but they didn't go to the judge and ask him to recuse himself so that the judge could give his explanation and his reasons why he wouldn't, so that we could analyze those reasons. We're left to our own imagination and understanding of what took place to be able to respond to his comments. So the government, I submit, takes his comments out of context, and all I can do is explain what I think he meant. With respect to the I'm going to go my own way, it was encouraged at that time because there was an en banc hearing before this court at the time of the hearing, so at that time there wasn't a final consideration of the black case. There was encouragement to follow the reasoning in Noonan's dissent and follow black. And he says I'll go my own way, meaning I'm my own judge, I'll make my own decision. So I don't think that in itself, and indeed he followed black, I would submit, in terms of his analysis. He didn't follow the dissent. He followed the test set out by black. That in itself, I submit, is not the high, high standard that the court, certainly special circumstances, that would in itself do that. The second one relates to the government's arguments that I ought to know on what the sentence should be, and that related to the application for whether he should be released. And there was comments about him not being a flight risk. And the government argued, well, there's a presumption that there's a flight risk, so the counter argument was, well, in this case here, this judge has already sentenced Mr. Hudson to only five years. So the idea in Hudson's, Dunlop's mind, right or wrong, was that he wasn't going to get that. And when he says, you know, I'm the one who does the sentencing, that's in every case that sentencing judge in a multiple defendant case sentences all the defendants and has to sentence defendants first. And so there's no bias because they've previously sentenced a co-defendant. In fact, one of the factors required to sentence a co-defendant under the guidelines is a disparity of sentences. So him having knowledge of what previous sentence he's given Hudson is not in itself a bias or a problem. You're now cutting into your associated counsel's time. Five seconds. The showing up of Dunlop was because he was there to watch Whitfield's hearing, and then when everybody left, he was advised that there was an order, so he went to the judge. The judge didn't call him to a coffee shop or private meeting. Your Honors, what the government is asking for here is an extraordinary remedy. It's not uncommon for this court to correct what it perceives to be legal errors of a district court, give them instructions, remand the case, and it's usually remanded to the same judge. I'm going to speak to the issues of reassignment that the government directed specifically towards my client. And one of those was that the government claims that the court sua sponte put my client on calendar for a bail hearing. That simply is not accurate. I had requested a bail hearing. The filing was made two days before. I think what happened was a clerical and calendaring error. Him being called in for a bail hearing was in response to an application that I filed for a bail hearing and not anything that the judge sua sponte did on his own, acting as the government contends as an advocate. The other issue that I believe that shows the judge can follow the law and be impartial is the fact that when I initially filed my motion to withdraw the guilty plea, it was filed twice. The first time it was denied. The judge considered the law and denied my request to withdraw the guilty plea based on ineffective assistance of counsel, and he carefully and impartially considered the law and denied the motion. It was not until the motion was renewed later on a different ground that the court granted my request. There has been no showing that he is recalcitrant or unwilling to follow this court's rulings. I would request that as the ordinary course of the way these cases usually go, that if the court does remand the case and reverse his decision, that it be sent back to Detroit. Thank you. Roberts. Okay. Thank you very much. Kennedy. Let me ask you on just a point of information. Is the Holden sentencing final? Yes. So he has been sentenced. He has a pending appeal. He's filed a notice of appeal. So he's appealed. Government has an appeal. That's correct, Your Honor. Thank you. Okay. Thank you very much. Excuse us for taking longer on this one than originally scheduled. United States v. Dunlap and Whitfield now submitted for decision.
judges: Tashima, Fletcher, Bybee